Filed 7/31/23  P. v. Bethell CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN WILLIAM BETHELL,<br><br>Defendant and Appellant. | D079729<br><br><br><br>(Super. Ct. No. FSB19004093) |


APPEAL from a judgment of the Superior Court of San Bernardino, Harold T. Wilson, Jr., Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Steven William Bethell guilty of two counts of inflicting corporal injury on a spouse or cohabitant (Pen. Code, §273.5, subd. (a))[1], sexual penetration of an unconscious or asleep person (§ 289, subd. (d)), and sexual penetration of a drugged person with a foreign object (§ 289, subd. (e)). The trial court sentenced him to ten years in prison.

Bethell asserts several arguments on appeal. First, he contends his right to a speedy trial, under both the federal and state Constitutions as well as California statutory law, was violated due to prosecution dismissals coupled with COVID-19 pandemic-related delays. Second, he contends his rights to due process and a fair trial were violated by the consolidation of three cases. Third, Bethell argues his right to due process was violated by the admission of evidence of uncharged acts of sexual assault and domestic violence under Evidence Code sections 1108 and 1109, respectively. Finally, Bethell takes issue with four jury instructions regarding the use of charged and uncharged acts of sexual assault and domestic violence for purpose of propensity evidence. We conclude none of Bethell's arguments have merit and therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A jury found Bethell guilty of two counts of inflicting corporal injury on a spouse or cohabitant (§ 273.5, subd. (a); counts 3 & 4), sexual penetration of an unconscious or asleep person (§ 289, subd. (d); count 5), and sexual penetration of a drugged person with a foreign object (§ 289, subd. (e); count 6). The jury acquitted Bethell of forced oral copulation (§ 287, subd. (c)(2)(A); count 1) and was unable to reach a verdict as to a second count of the same charge (count 2).

---

[1]     Unless otherwise indicated, all further statutory references are to the Penal Code.

2

The charges involved two victims, S.M. and B.W.

## A. Crimes Against S.M. (Counts 1 through 4)

S.M. became romantically involved with Bethell in 2017 and moved into his mobile home in Big Bear in February 2018. Bethell assaulted her for the first time shorty after they moved in together.

In March 2018, Bethell pushed S.M. into a door frame and she suffered a black eye. When her eye was still healing, he pushed her into a stack of wooden pallets and she reinjured the same eye. He caused her to have black eyes about two more times. S.M. testified that he assaulted her every few weeks—pulling her hair, pushing her into things.

In February or March 2019, after having consensual sex, Bethell told S.M. to orally copulate him. She did not want to but complied because he was being demanding and angry, and she thought he would hurt her if she did not. She cried the whole time.

On June 10, 2019, Bethell blamed her for an eviction notice from the mobile home park. He became violent, punched her in the stomach, threatened her with an axe, pushed her to the floor, and put his hands over her mouth and on her neck. As she struggled to get away from him, a dresser fell over and power tools that were on top of the dresser fell on her, causing her to bleed. Bethell allowed her to use the kitchen sink to clean herself up, then came up behind her and told her to get on her knees and orally copulate him, saying "get on your knees and suck the dick, bitch." She complied because she was fearful for her life. She was "shaking and crying" as she did so. S.M. went to the police after this incident and gave a statement about what happened.

W.M. lived with Bethell and S.M. in a spare bedroom for approximately one year in 2018 and 2019. He testified that he saw Bethell physically

3

assault S.M. often and described one incident when Bethell screamed at S.M., chased her around the house, pushed her to the ground, slapped her head and face, and pulled her hair. At times, he saw S.M. bleeding from injuries caused by Bethell.

The jury convicted Bethell of two counts of domestic violence against S.M. The jury did not convict Bethell of two counts of forced oral copulation of S.M.

## B. Crimes Against B.W. (Counts 5 and 6)

B.W. was in a five-year romantic relationship with Bethell from 2012 to 2017. They began living together in 2015 and Bethell began physically abusing her soon after. He also controlled her anxiety medication. On five or six occasions, B.W. woke up with vaginal bleeding and was "not able to walk," and she had no recollection of the night before.

Eighteen months after terminating her relationship with Bethell, B.W. became aware of approximately 200 disturbing images on an old computer that belonged to Bethell. The images depicted her laying down "look[ing] dead," with Bethell's arm inside her vagina. B.W.'s current boyfriend J.B. found the images on the computer and testified about the content of the images. He said B.W. looked "obviously unconscious," "fully nude," and "propped up on the bed," bleeding from her vagina, with Bethell sitting on a chair in front of the bed "pretty much sodomizing her with his hands." Bethell's hand was inside B.W. up to his elbow. In some pictures, there was a bottle with writing in permanent marker that said GHB, which B.W. thought was a date rape drug. A forensic toxicologist testified that GHB or Xanax, particularly mixed with alcohol could cause a state of unconsciousness such that one would be unaware of being sexually assaulted.

4

The jury convicted Bethell of two sexual offenses against B.W.: (1) sexual penetration of an unconscious or asleep person, and (2) sexual penetration by anesthesia or controlled substance.

## DISCUSSION

### I. Bethell's Right to a Speedy Trial Was Not Violated

Bethell's contention that his conviction must be reversed because he was denied the right to a speedy trial involves two periods of delay: (1) a time period of delay caused by the prosecutor refiling charges three times, and the trial court's order denying Bethell's motion to dismiss the third filing; and (2) a time period of delay caused by continuances due to the disruption of the trial court's operations caused by the COVID-19 pandemic. We conclude the trial court did not abuse its discretion in denying Bethell's motion to dismiss the third filing because the second dismissal was on the court's own motion and there was excusable neglect. Next, we conclude the delays due to the COVID-19 pandemic did not violate Bethell's right to a speedy trial because the pandemic constituted good cause for the delay and Bethell failed to show prejudice from the delay.

#### 1. The Trial Court Did Not Abuse Its Discretion by Denying Bethell's Motion to Dismiss the Prosecution's Third Filing

##### a. Additional Facts

The prosecution originally filed a complaint against Bethell in case number FSB19002126. After motions in limine, on the People's motion based on newly discovered evidence, the case was dismissed pursuant to section 1385 and both parties stipulated to the case proceeding under the same case number pursuant to section 1387.2.

In the second case, on November 18, 2019, the court indicated that a jury panel would be screened and motions in limine would be heard on

December 2, 2019. On the afternoon of December 2, the court stated on the record "we had a chambers' conference earlier regarding availability of the People's witness." The prosecutor confirmed "yes, your honor, our last contact with the victim in this case was on the 15th. We've lost contact with her. We've been unable to locate her. Investigators have been working to try to find her. As of right now, we are unable to do so." The court responded, "today was the 60th day. People being unable to proceed, the court will dismiss the case under section 1387." The court then asked if the People intended to refile and the prosecutor stated they would.[2]

That same day, the People filed a complaint against Bethell under a new case number FSB19004093, alleging one count of oral copulation. Bethell moved to dismiss, arguing that the complaint was barred under the two-dismissal rule of section 1387 and that the prosecution could not meet its burden of showing excusable neglect under section 1387.1, which would permit a third refiling. In opposition, the People represented that on December 2, the prosecutor notified the court and defense counsel that she had not heard from the victim recently but believed she could begin trial in anticipation of the victim appearing. The court told the prosecutor that she had until 2:00 p.m. to produce the witness in court or the case would be dismissed. The prosecutor was unable to contact the victim and the court dismissed the case that afternoon.

At a hearing on December 12, 2019, Bethell asserted that the prosecutor dismissed both the first and second filings in bad faith after

---

[2]    Bethell's unopposed request for judicial notice, filed on February 6, 2023 is granted. Pursuant to Evidence Code section 452, subdivision (d), we take judicial notice of the reporter's transcripts and court documents from case number FSB19002126, as outlined in Bethell's request and as previously prepared by the Clerk of the San Bernardino County Superior Court.

receiving unfavorable evidentiary rulings on its motions in limine. The trial court reviewed the reporter's transcript from the December 2, 2019 hearing and stated multiple times that it showed the court dismissed the case on its own motion, not the prosecution's. The court explained that there was a difference between the People wanting to proceed on a case while hoping to get a witness to appear and having to later dismiss because they were not able to, as opposed to the court not allowing the People to proceed in the first place. The court then indicated that if the prosecutor did not have a witness in court when the court wanted them there, that would amount to excusable neglect.

To show due diligence in attempting to secure the victim's appearance in court, a district attorney investigator testified that he served the victim with a summons to appear in August 2019. The victim advocate also testified that she was in contact with the victim, who was cooperative. However, the last time she was able to get into contact with the victim prior to the December 2, 2019 hearing was on November 15, 2019. She left voicemails for the victim on November 18 and November 27, but had not heard back from the victim by the December 2 hearing. She further testified that the victim had called her that morning, on December 12, and provided her with a new address and new phone number. That was the first time she spoke with the victim since November 15.

Another district attorney investigator testified that on December 2 at around 8:00 a.m., he drove to the victim's last known address at the time, which was the mobile home park in Big Bear. Once he arrived at around 12:00 p.m., he observed that the mobile home was obviously vacant.

After hearing this evidence, the trial court confirmed its stated finding that the second filing was dismissed on the court's own motion due to the

7

prosecutor's excusable neglect, and allowed the third filing to proceed under section 1387.1.

### b. Applicable Law

Section 1387, subdivision (a) provides in pertinent part:  "An order terminating an action pursuant to this chapter . . . is a bar to any other prosecution for the same offense if it is a felony . . . and the action has been previously terminated pursuant to this chapter . . . ."  This commonly is called the two-dismissal rule in felony cases.  (*People v. Mason* (2006) 140 Cal.App.4th 1190, 1195 (*Mason*).)

Section 1387.1 carves out an exception to the two-dismissal rule when the action involves a violent felony, as defined in section 667.5.  Under section 1387.1, a third filing is permitted where (1) either of the prior dismissals were "due solely to excusable neglect," and (2) the conduct of the prosecution did not "amount[] to bad faith."  (*Mason*, *supra*, at p. 1196.)

The statute broadly defines excusable neglect by stating it "includes, but is not limited to, error on the part of the court, prosecution, law enforcement agency, or witnesses."  (§ 1387.1, subd. (b).)  " ' "[E]xcusable neglect is neglect that might have been the act or omission of a reasonably prudent person under the same or similar circumstances." ' "  (*People v. Massey* (2000) 79 Cal.App.4th 204, 211 (*Massey*), quoting *People v. Woods* (1993) 12 Cal.App.4th 1139, 1149 (*Woods*.)

The application of section 1387.1 is a discretionary determination for the trial court, which should be afforded great weight unless clear abuse of discretion is demonstrated.  (*Massey*, *supra*, 79 Cal.App.4th at p. 211.)  And " '[u]nless *inexcusable* neglect is clear, the policy favoring trial on the merits prevails.' "  (*Ibid.*, quoting *Woods*, *supra*, 12 Cal.App.4th at p. 1149, italics added by *Massey*.)

### c. Analysis

As an initial matter, the only offense that was dismissed and refiled a third time was one count of forcible oral copulation (§ 287, subd. (c)(2)(A)). The other counts were filed in separate complaints and later consolidated, as discussed below. As such, the only offense subject to this section 1387.1 analysis is forcible oral copulation, which qualifies as a violent offense as defined in section 667.5 and is therefore subject to section 1387.1's exception to the two-dismissal rule. (See § 667.5, subd. (c)(5).) Bethell does not dispute this.

As he did below, Bethell contends that on December 2, the court gave the prosecutor a choice between dismissing the second filing or starting trial, and that the prosecutor opted to dismiss. However, the transcript from the December 2 hearing shows otherwise. There is no indication that the court allowed the prosecutor to choose to proceed or that the prosecutor moved to dismiss. Rather, the court dismissed the case on its own after the prosecutor informed the court that she lost contact with the victim and that investigators had been trying to find her but were unable to locate her.[3]

Bethell contends that when the court considered his motion to dismiss on December 12, it did not have the December 2 transcript. However, the December 12 transcript shows the trial court did review the earlier transcript, stating "if you review the transcript, the dismissal was made by the court." The court even quoted the earlier judge, reading " 'Today is the

---

[3]     The minute order from the December 2 hearing states "[u]pon motion of the People:  Case Dismissed." However, we rely on the reporter's transcript based on the rule that "[c]onflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249; *People v. Smith* (1983) 33 Cal.3d 596, 599.)

60th day. People being unable to proceed, the [c]ourt will dismiss the case under 1387.'" As such, the record does not support Bethell's argument that the People chose to dismiss the second filing or did so in bad faith.

Next, we conclude the trial court did not abuse its discretion in finding that the second dismissal was the result of excusable neglect. The neglect was the failure of the People to have the victim in court on the date set for trial, on December 2, 2019. This neglect was excusable because reasonable efforts were made to maintain contact with the victim to ensure that she would appear in court when needed. And when the victim advocate lost contact with the victim after November 15, the prosecution's investigator drove to the victim's last known address in an attempt to locate her. The unsuccessful efforts to contact the victim were explained when the victim later, but not until December 12, informed the victim advocate that she had a new address and new phone number. Based on this, we cannot say that the People's failure to secure the victim's attendance in court on December 2 was clearly inexcusable.

2. The Delay Due to the COVID-19 Pandemic Was Justified and Bethell Failed to Show Prejudice from the Delay

a. Additional Facts

As discussed earlier, after two dismissals, the People filed the instant complaint under case number FSB19004093 on December 2, 2019. Additional felony charges were filed under case numbers FSB19004237 and FSB19004365 on December 13 and 24, 2019, respectively. A preliminary hearing occurred for all three matters on March 23, 2020 and Bethell was held to answer. Individual informations for each of the three matters were filed on March 30, 2020. On April 1, 2020, Bethell entered not guilty pleas to all charges and all three matters were set for jury trial on May 26, 2020.

10

From April 24, 2020 until March 9, 2021, the trials were continued at least nine times due to the COVID-19 pandemic emergency orders and there being no available courtrooms. During that time period, the trials were also continued at least 10 times by stipulation, Bethell's request, defense counsel's unavailability, or due to Bethell being hospitalized or being quarantined. During this entire time, general orders were in place that extended the deadline to hold a criminal trial due to the exceptional circumstance of the COVID-19 pandemic.[4]

On March 10, 2021, the trial court granted the prosecution's motion to consolidate the three cases against Bethell, and sent the matter to trial. A jury panel was sworn the next day, March 11, 2021.

### b. Federal Constitutional Challenge

"For the federal Constitution's speedy trial right, the United States Supreme Court has articulated a balancing test that requires consideration of the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*People v. Martinez* (2000) 22 Cal.4th 750, 755 (*Martinez*), citing *Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*), italics omitted.) "When the delay is of sufficient length to be presumptively prejudicial, any actual prejudice is balanced with

---

[4] On our own motion, we take judicial notice of the general orders of the presiding judge of the San Bernardino County Superior Court, which extended the deadline to hold criminal trials due to the pandemic during the timeframe when Bethell's trial was delayed. (Super. Ct. San Bernardino County, Gen. Orders (April 1, 2020 – February 18, 2021), < COVID-19: COURT OPERATIONS DURING THE COVID-19 PANDEMIC | Superior Court of California (sb-court.org) > [as of July 31, 2023], archived at **<https://perma.cc/WJ9U-Y9EU>**.)

11

the other *Barker* factors, including the justification for the delay." (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 938 (*Elias*).)

The Supreme Court has observed that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." (*Doggett v. U.S.* (1992) 505 U.S. 647, 652, fn. 1 (*Doggett*).) Here, the approximate 11-month delay experienced by Bethell "approaches one year." (*Ibid.*) We accordingly assume, for the sake of our analysis, that he has shown *presumptive* prejudice. We therefore proceed to conduct a balancing of any *actual* prejudice with the other *Barker* factors. (*Elias, supra,* 78 Cal.App.5th at p. 938.)

As we have explained, the four *Barker* factors are "the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*Martinez, supra*, 22 Cal.4th at p. 755.) "None of these four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.' [Citation.] 'The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant.' " (*People v. Bradley* (2020) 51 Cal.App.5th 32, 41 (*Bradley*).)

Regarding the first factor, i.e., the length of the delay, we consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." (*Doggett, supra*, 505 U.S. at p. 652.) Because "the presumption that pretrial delay has prejudiced the accused intensifies over time" (*ibid.*), "in ways that neither party can prove or, for that matter, identify" (*id.* at p. 655), it is significant when the "delay before trial was uncommonly long" (*id.* at p. 651). Here, because the

12

approximate 11-month delay does not in any sense "stretch[ ] beyond the bare minimum needed to trigger judicial examination of the claim" (*id.* at p. 652), it cannot reasonably be described as "uncommonly long" (*id.* at p. 651), and thus does not meaningfully contribute to the finding of a speedy trial violation under the *Barker* factors.

"In applying the second factor, the reason for the delay, the United States Supreme Court has asked, 'whether the government or the criminal defendant is more to blame for th[e] delay.' [Citation.] A delay meant to hamper the defense weighs heavily against the prosecution, while more neutral reasons such as negligence or overcrowded courts weigh less heavily." (*Bradley*, *supra*, 51 Cal.App.5th at p. 41.) Here, it is undisputed that the COVID-19 pandemic was the primary cause for the delay and Bethell does not contend that the government was at all to blame. As we explained in *Elias*, "[c]ourts have recognized that '[h]ealth quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date.' [Citations.] ' "A contrary holding would require trial court personnel, jurors, and witnesses to be exposed to debilitating and perhaps life-threatening illness. Public health concerns trump the right to a speedy trial." ' " (*Elias*, *supra*, 78 Cal.App.5th at p. 942.) In the context of the COVID-19 pandemic, *Elias* observed, "The backlog here was not a routine or chronic condition for the court. The COVID-19 pandemic has been a ' "unique, nonrecurring event[ ]" ' which ' "ha[s] produced an inordinate number of cases for court disposition." ' [Citation.] Although the continuances in this case have been lengthy, the COVID-19 pandemic has been 'of such severity as to justify' the continuance." (*Id.* at p. 941.) As in *Elias*, "[w]e acknowledge the ' "unfortunate hardship to defendant" ' from the delays in this case, but, . . . ' "neither the prosecution nor the court is

13

responsible for the emergency that has overwhelmed the nation and much of the world." ' " (*Id*. at p. 942.) As in *Elias*, we accordingly conclude that the COVID-19 pandemic constituted good cause for the delay of Bethell's trial.

"In assessing the third *Barker* factor (i.e., defendant's assertion of his speedy trial right), we note 'the weight ascribed to complaints of pretrial delay ordinarily depends upon their frequency and force.' " (*Bradley, supra*, 51 Cal.App.5th at p. 42.) Here, the People acknowledge that Bethell repeatedly asserted his right to a speedy trial.

"For the fourth and final *Barker* factor, prejudice to the defendant, we must consider the circumstances of this case in light of the interests the speedy trial right is intended to protect. [Citation.] Those interests, as identified by the United States Supreme Court, are '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " (*Bradley, supra*, 51 Cal.App.5th at p. 43.) "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." (*Barker, supra,* 407 U.S. at p. 532.)

Here, Bethell argues he suffered a detrimental impact on his life, was subject to anxiety, and contracted COVID-19. He also contends his defense was negatively impacted by the delay because it resulted in a second complaining witness coming forward and two additional complaints being filed, and gave the two witnesses the opportunity to coordinate their testimony. This argument is misguided because the additional complaints were filed prior to the COVID-19 delays and any opportunity the prosecution

14

had to strengthen its case (although Bethell points to no support for this in the record) does not equate to impairment of his ability to present a defense such as the loss of exculpatory evidence or dimming memories. Regarding Bethell's other interests, as we explained in *Elias*, "[a]lthough he has had a lengthy incarceration during the pendency of his unresolved criminal charges, he is in the same position as hundreds of other in custody defendants awaiting trial due to COVID-19 pandemic delays." (*Elias*, *supra*, 78 Cal.App.5th at p. 943.) " 'Significant pretrial incarceration may support a presumption of prejudice, but this prejudice "unenhanced by tangible impairment of the defense function and unsupported by a better showing on the other factors than was made here, does not alone make out a deprivation of the right to a speedy trial." ' " (*Bradley*, *supra*, 51 Cal.App.5th at p. 43.)

Based on the four *Barker* factors, we conclude that in light of the minimal prejudice identified by Bethell, weighed against the good cause for the delay arising from the COVID-19 pandemic, Bethell has not established that he was deprived of his federal constitutional right to a speedy trial.

### c. California Constitutional Challenge

In a speedy trial challenge based on the California Constitution, "[t]he defense has the initial burden of showing prejudice from a delay in bringing the defendant to trial. Once the defense satisfies this burden, the prosecution must show justification for the delay. If the prosecution does that, the trial court must balance the prejudice to the defendant resulting from the delay against the prosecution's justification for the delay." (*People v. Lowe* (2007) 40 Cal.4th 937, 942.)

Here, Bethell's challenge under the California Constitution fails at the first step. As we have discussed above, although Bethell contends he was

prejudiced by the COVID-19 delays, he has not shown actual prejudice or impairment of his ability to present a defense.

Even if we were to assume for the sake of our analysis that Bethell established he was prejudiced, at least to some extent by the delay in bringing his case to trial, the COVID-19 pandemic constituted good cause for the delay, as we have already discussed. In balancing any minimal prejudice that Bethell may have incurred against the good cause for the delay, we conclude that Bethell has not established a violation of his right to a speedy trial under the California Constitution.

### d. California Statutory Violation

" ' "To implement an accused's constitutional right to a speedy trial, the Legislature enacted section 1382." ' " (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1122.) Section 1382 generally provides that, unless good cause to the contrary is shown or a waiver is obtained from the defendant, the court shall dismiss a felony prosecution that is not brought to trial within a 60-day statutory deadline after arraignment.

On appeal, Bethell asserts but does not develop an argument for a statutory violation of section 1382. Any such argument would fail based on this court's recent opinion in *Elias*. In *Elias* we explained that because of "[t]he series of emergency orders from the Chief Justice" that "extended the section 1382 period to commence trials for criminal defendants due to the COVID-19 pandemic," the time to bring the defendant to trial under section 1382 had not expired, and there was accordingly no violation of Bethell's statutory right to a speedy trial. (*Ibid*; *People v. Rubaum* (1980) 110 Cal.App.3d 930, 934 [showing of good cause for continuance is not required if the statutory time has not expired].)

16

II. Consolidation of the Charges Was Not an Abuse of Discretion nor Did It Violate Bethell's Due Process Rights

The People initiated three separate cases against Bethell, all involving charges of sexual assault and/or domestic violence. Bethell concedes that the consolidation of the charges met the statutory requirement for joinder because they were all of the same class. Nonetheless, he contends the trial court abused its discretion and violated his constitutional right to a fair trial by consolidating the three cases. We conclude Bethell's contention lacks merit.

### 1. Additional Facts

As discussed above, after dismissing two complaints under case number FSB19002126, the People refiled on December 2, 2019 under case number FSB 19004093. The information charged Bethell with a single count of forcible oral copulation (§ 287, subd. (c)(2)(A)). The victim was S.M.

On December 13, 2019, the People filed another complaint against Bethell under case number FSB19004237. The information charged Bethell with sexual penetration of an unconscious person (§ 289, subd. (d); count 1) and sexual penetration by anesthesia or controlled substance (§ 289, subd. (e); count 2). The victim was B.W.

On December 24, 2019, the People filed a third complaint against Bethell under case number FSB19004365. The information charged Bethell with forcible oral copulation (§ 287, subd. (c)(2)(A); count 1), and two counts of injuring a spouse or cohabitant (§ 273.5, subd. (a); counts 2 & 3). The victim was S.M.

The People moved to consolidate arguing that the offenses in the three cases were of the same class of crimes because they have characteristics or attributes in common. The charges and evidence in each of the cases

centered around Bethell's nonconsensual sexual abuse and physical assault of an intimate partner. And while one case involved a different victim, the cases were nevertheless connected in that both victims alleged the crimes occurred in the same residence and described Bethell becoming sexually volatile when angry. The People also argued that Bethell would not be prejudiced by the consolidation of the cases because the evidence in the cases would be cross-admissible in separate trials under Evidence Code section 1108, which permits admission of other acts of sexual assault and Evidence Code section 1109, which permits other acts of domestic violence. Finally, the evidence in each case would not be unduly inflammatory if presented in the other cases and the strength of the cases were hardly distinguishable.

In opposition, the defense argued that both victims lacked credibility and urged that the prosecution sought to consolidate weak unrelated charges to improve the odds of conviction.

The court held a bench conference off the record and then stated on the record that the cases were consolidated.

2. Applicable Law

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395 (*Scott*).) Section 954 states: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately." (§ 954.) Where

defendants are charged with having committed " 'common crimes involving common events and victims,' . . . the court is presented with a ' "classic case" ' for a joint trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.)

Where, as here, " 'the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.' [Citation.] 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 388–389.)

3. Analysis

As we have noted, Bethell concedes joinder was proper under section 954. But he asserts the joinder violated his due process right to a fair trial because some of the evidence was not cross-admissible, the evidence together painted him as a horrible person and was likely to inflame the jury, and it joined a strong case with two weak cases. We are not persuaded. Rather, we conclude Bethell has failed to demonstrate a clear showing of potential prejudice, and thus has not established that the trial court abused its discretion in allowing the charges to be tried together.

First, the cross-admissibility of the evidence is sufficient to negate prejudice without any further showing. (*Scott, supra*, 61 Cal.4th at p. 396.) Bethell concedes that the evidence in the two cases involving charges of

sexual assault and domestic violence of S.M. would have been cross-admissible but contends evidence in the case involving charges of sexual assault of B.W. would not have been. However, Evidence Code section 1108, which allows evidence of other acts of sexual assault to be admitted as propensity evidence, would have provided grounds for cross-admissibility between the cases involving S.M. and the case involving B.W. Even assuming evidence of the incidents were not cross-admissible, the absence of this factor is not dispositive. (*People v. Soper* (2009) 45 Cal.4th 759, 775.) Section 954.1 explicitly states "evidence concerning one offense or offenses *need not be admissible* as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (Italics added.) In the hypothetical "absence of cross-admissibility, we turn to the remaining factors to assess whether the trial court abused its discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 123–124 (*Simon*).)

Second, Bethell claims that the evidence together painted him as a horrible person. However, the "the issue is 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (*Simon, supra*, 1 Cal.5th at p. 124.) Bethell does not identify any evidence that addresses this inquiry. The factual circumstances for each instance of sexual assault and domestic violence may have been "different in their particulars," but were "equally abhorrent." (*People v. Price* (1991) 1 Cal.4th 324, 390.)

Third, Bethell argues that the most straightforward charge was forcible oral copulation that occurred on June 10, 2019, because S.M. spoke with law enforcement the next day. He contends that the jury finding him not guilty of this charge "is at least a possible testament to the problems of overcharging by the prosecution and overwhelming the jury." He also asserts the evidence

against him was "unfairly bolstered by the extensive amount of spillover evidence." As an initial matter, we disagree that the June 10, 2019 incident was necessarily the most straightforward case. For example, there was no corroborating witnesses to this charge where by contrast the jury heard from W.M., who witnessed Bethell's domestic violence of S.M. and as well as J.B., who saw pictures of Bethell sexually assaulting B.W. It is "always . . . possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 781.) Moreover, severance is not required "because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*Ibid.*) To demonstrate the potential for a prejudicial spillover effect, a defendant must show an "extreme disparity" in the strength or inflammatory character of the evidence. (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.) Bethell has not shown that here.

Finally, none of the counts against Bethell were a capital charge nor did the joinder of charges convert the matter into a capital case.

In reviewing the four factors to be considered, we conclude Bethell has failed to establish a " 'clear showing' of potential prejudice," and therefore cannot show the trial court abused its discretion in consolidating the cases. (*Simon*, *supra*, 1 Cal.5th at p. 123.)

Even if, as we have concluded, joinder was proper and there was no sufficient showing of prejudice at the time the trial court ruled, "we must also determine 'whether events *after* the [trial] court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of [a]

21

defendant's constitutional right to fair trial or due process of law.' " (*Simon*, *supra*, 1 Cal.5th at p. 129.) "[A] judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Id*. at pp. 129–130.) "Appellate courts have found ' "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials." ' " (*Soper*, *supra*, 45 Cal.4th at p. 784.)

Here, the charges that the jury convicted on were each supported by "relatively balanced" and sufficiently "strong" evidence. (See *People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1437 [no prejudice where "the strength of the evidence as to each incident was relatively balanced"].) Namely, as we discussed, the jury heard corroborating evidence from third party witnesses. Moreover, the court instructed the jury that each of the counts was a separate crime that must be separately decided. (CALCRIM No. 3515.) Bethell has pointed to nothing in the record that indicates the jury failed to follow this instruction. (*People v. Merriman* (2014) 60 Cal.4th 1, 48–49 [absent contrary showing, jury presumed to follow instructions to consider each count separately].) We conclude it was not "reasonably probable" that the jury was improperly "influenced by the joinder" and that the joinder therefore did not violate Bethell's due process rights. (See *Simon*, *supra*, 1 Cal.5th at pp. 129–130.)

III. The Trial Court Did Not Abuse Its Discretion by Admitting Propensity Evidence Pursuant to Evidence Code Sections 1108 and 1109

Bethell asserts his right to due process was violated by the admission of evidence of other acts of sexual assault and domestic violence as propensity

evidence under Evidence Code sections 1108 and 1109, respectively.[5]  He primarily argues that Evidence Code section 352 is not an adequate safeguard against the unfairness of propensity evidence and urges us to reexamine contrary case law.  We decline to do so and conclude that the trial court did not abuse its discretion in weighing the probative value of the evidence against the risk of undue prejudice.

1.  Additional Facts

The People filed motions in limine to admit evidence of uncharged acts of sexual assault under Evidence Code section 1108 and domestic violence under Evidence Code section 1109.

First, the People sought to introduce evidence that in 2015, B.W. awoke to Bethell on top of her and with her pants and underwear removed, which resulted in a physical altercation.  She reported this incident to the police and was not sure if Bethell had performed sexual acts on her without her knowledge.  The People argued that this evidence was admissible to support B.W.'s credibility, and to show Bethell's propensity to disregard consent of intimate partners because similar to the current charge involving Bethell sexually assaulting B.W. in her sleep, this was a prior incident that she

---

[5]     Bethell also contends the trial court erred in admitting this evidence as modus operandi under Evidence Code section 1101, subdivision (b).  However, his entire argument addresses propensity evidence under Evidence Code sections 1108 and 1109.  He does not discuss authority regarding modus operandi evidence under Evidence Code section 1101 or analyze the propriety of the evidence under that section.  We are not required to address arguments that the appellant has not supported with pertinent legal authority and analysis. (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 981–982; see also *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["an appellant is required to not only cite to valid legal authority, but also explain how it applies in his case"]; California Rules of Court, rule 8.204(a)(1)(B) [each point must be supported by argument].)  We therefore limit our review to Evidence Code sections 1108 and 1109.

reported to police of her not realizing that he was assaulting her in her sleep. The court concluded this evidence was admissible under Evidence Code section 1108.

Second, the People sought to introduce evidence that in June 2017, Bethell pushed B.W. against a wall causing her to hit her head against a hook, pushed her to the floor, and covered her mouth and nostrils in an attempt to suffocate her. B.W.'s sister, M.R., heard arguing and screaming and saw Bethell covering B.W.'s mouth and nostrils with his hand, and called the police. The prosecutor argued this was evidence of another reported incident of domestic violence and the court concluded it was admissible under Evidence Code section 1109.

Third, the People sought to introduce evidence of unreported physical abuse that B.W. suffered, including Bethell causing 20 black eyes and pulling her across the floor by her hair 15 to 20 times. The People argued this was evidence of unreported domestic violence and the court concluded it was admissible under Evidence Code section 1109.

Fourth, the People sought to admit evidence that Bethell would hit B.W. when she refused to have sex with him or use a sex toy on him. She estimated five incidents in which Bethell kicked her out of the mobile home because she refused to assist him with the use of a sex toy and each time she tried to reenter the home through a dog door, Bethell kicked her in the head. The People argued this evidence was admissible to show Bethell's propensity to use violence and duress to gain compliance for his sexual cravings, consistent with the charges of forceable oral copulation involving S.M. The court concluded this evidence was admissible under Evidence Code section 1108.

24

Fifth, the People sought to admit evidence that B.W.'s mother, T.D., observed Bethell being verbally controlling of B.W. and hitting her. The People argued this was evidence of Bethell's propensity to engage in domestic violence, consistent with S.M.'s allegations. The court concluded this evidence was admissible under Evidence Code section 1109.

Sixth, the People sought to admit evidence that Bethell's former roommate, M.G., was beaten by him approximately 10 times. He punched and slapped her face, pushed her, and threw things at her. The People argued this was evidence of Bethell's propensity to engage in domestic violence consistent with the allegations regarding S.M. The court concluded this evidence was admissible under Evidence Code section 1109.

Finally, the People sought to admit evidence that M.G. woke up to Bethell sexually penetrating her. She began to believe Bethell was drugging her in order to molest her because she was unable to recall what happened the night before. Bethell admitted to "slipping" her a Xanax from a prescription bottle with B.W.'s name on it to help her relax. He would also get angry and violent if M.G. did not want to participate in sexual acts that made her uncomfortable. The People argued this evidence showed that Bethell had a propensity to commit sexual acts on others without their consent, consistent with the allegations that Bethell forced S.M. to orally copulate him, and consistent with the allegations that Bethell sexually penetrated B.W. while she was unconscious. The court concluded this evidence was admissible under Evidence Code section 1108.

For each of the uncharged acts of sexual assault or domestic violence, the court found that the probative value of the evidence outweighed any prejudice.

25

In accordance with the People's offer of proof, B.W. testified that in 2015, she woke up with Bethell on top of her with her pants and underwear taken off, which led to Bethell physically assaulting her. B.W. testified that most fights began over sex and Bethell's sexual demands. He also forced her to orally copulate him and participate in sexual activity with the use of a sex toy against her will. She also testified that Bethell would hit, punch, slap, and kick her, pull her hair, and put her in a choke hold. During the course of Bethell's abuse, B.W. suffered black eyes, fat lips, bloody noses, bumps, and scars. Sometimes, Bethell would lock B.W. outside in the cold forcing her to crawl through a dog door to get back inside.

B.W.'s sister, M.R., testified that in June 2017, she heard yelling and screaming, then saw Bethell choking B.W. in the hallway.

B.W.'s mother, T.D., testified that she observed Bethell beating B.W. and throwing a urine-soaked sock at her. Once, when T.D. arrived at the mobile home, B.W. "ran out of the house and had blood coming from her nose and mouth and scratches and cuts on her."

M.G. testified that initially, she and Bethell were just roommates, however, Bethell eventually moved her furniture and belongings into his room and they commenced a sexual relationship. At some point, she became disinterested and told Bethell that she was no longer willing to engage in sex with him. She began to suspect that Bethell was sexually molesting her in her sleep because she sometimes woke up feeling lethargic and would have odd abdominal pain, with no memory of the night before. Once, she woke up in a sexual position with Bethell's hand inside her vagina. Prior to this incident, M.G. had found a bottle of Xanax in the mobile home with B.W.'s name on it, and when she confronted Bethell about it, he "blurted out" that he would not have to drug her "if [she] wasn't such a prude."

26

M.G. testified that Bethell would also push her around and slap her. He would push her to the ground, punch and choke her, and threatened to kill her with a gun. Much of the time, his anger stemmed from her being unwilling to engage in "weird" sexual acts that he tried to "lure" her into performing.

Following the evidence, the trial court instructed the jury as to its limited use of the evidence pursuant to Evidence Code section 1108 and 1109.

 2. Applicable Law

Evidence of a person's character or predisposition to act in a certain way is generally inadmissible to prove conduct in conformance with that character trait on a given occasion. (§ 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.)

However, Evidence Code section 1108 creates an exception to this general rule, providing that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1108, subd. (a).)

Evidence Code section 1109 creates another exception, providing that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a)(1).)

By Evidence Code section 1108's and 1109's incorporation of Evidence Code section 352, evidence of a prior sexual offense or domestic violence is admissible *unless* "its probative value is substantially outweighed by the

27

probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) " 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

The "prejudice" contemplated in Evidence Code section 352 refers to evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Such evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an improper purpose. (*Ibid.*)

We review a challenge to a trial court's decision to admit evidence for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.) "A trial court's exercise of its discretion under [Evidence Code] section 352 ' "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.) "[A] trial court does not abuse its discretion

unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

    3. Analysis

Bethell first challenges the constitutionality of Evidence Code sections 1108 and 1109, arguing that Evidence Code section 352 is not an adequate safeguard against the unfairness of propensity evidence. However, the California Supreme Court has already rejected a due process challenge to the use of propensity evidence under Evidence Code section 1108 and concluded that Evidence Code section 352 provides substantial protections of a defendant's constitutional rights. (*People v. Falsetta* (1999) 21 Cal.4th, 903, 915–917 (*Falsetta*).) Following binding precedent, as we are required to do (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), this court has already rejected due process challenges to Evidence Code sections 1108 and 1109, and we do so again. (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704; *People v. Manning* (2008) 165 Cal.App.4th 870, 877.)

Bethell argues that even if Evidence Code sections 1108 and 1109 are constitutional, the trial court still erred in admitting the propensity evidence. His briefing conclusively asserts that under the circumstances of this case, the prejudicial impact of the propensity evidence far outweighed any probative value.

Bethell does not analyze or attack the probative value of the evidence. Nonetheless, we conclude evidence of his uncharged sexual assaults of B.W. and M.G. were sufficiently similar to the charged offenses that he forced S.M. to orally copulate him and that he sexually penetrated B.W while she was asleep or unconscious. Evidence of both the charged and uncharged acts involved Bethell getting angry and acting violently when women would not

comply with his sexual demands as well as performing sexual acts on women without their knowledge either while they were asleep, unconscious, or drugged.

Likewise, Bethell's uncharged acts of domestic violence of B.W. and M.G. were sufficiently similar to the charged offenses that he physically abused S.M. The charged and uncharged incidents involved Bethell pushing, hitting, pulling hair, and suffocating or choking the women. Additionally, the relationships and circumstances were similar in that each of the women lived with Bethell and to some extent had a romantic or consensual sexual relationship with him.

Regarding the prejudicial impact of the evidence, Bethell merely contends "[t]here is little in our society that evokes a more emotional response and bias than the subject matter in this case." However, the evidence of his uncharged acts of sexual assault and domestic violence were no more inflammatory than the charged offenses.

In sum, Bethell has not met his burden on appeal of showing the court abused its discretion in determining that the probative value of the evidence regarding his uncharged acts of sexual assault and domestic violence was not substantially outweighed by the risk of undue prejudice. Because we conclude there was no error, we need not and do not reach Bethell's claim of prejudice from the asserted error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[6]

---

[6]    Bethell also argues the admission of the evidence was prejudicial under *Chapman v. California* (1967) 386 U.S. 18 and appears to assert that this standard applies because the error violated his right to due process. Based on our rejection of Bethell's due process claim, we disagree that this standard would have applied.

IV. The Trial Court Did Not Commit Instructional Error

Bethell argues the jury instructions regarding the limited use of propensity evidence and particularly the applicable burdens of proof were confusing. He also contends the instructions were argumentative and improperly allowed the complaining witnesses to corroborate their own accusations. We disagree.

1. Applicable Law

"A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

Instructional error requires reversal of the judgment only if it resulted in a miscarriage of justice—which, in this context, means that there is a reasonable probability that the defendant would have achieved a more favorable result in the absence of the error. (Cal. Const., art. VI, § 13; *Watson, supra*, 46 Cal.2d at p. 836; see *People v. Moore* (2011) 51 Cal.4th 1104, 1130–1133 [applying *Watson* harmless error analysis to claim of instructional error regarding permissive inferences]; *Falsetta, supra*, 21 Cal.4th at pp. 924–925 [applying *Watson* standard to alleged error in failing to instruct jury on proper use of propensity evidence].)

2. Analysis

The court gave CALCRIM No. 852A regarding the use of evidence of uncharged domestic violence for propensity purposes, and CALCRIM No. 852B regarding the use of evidence of charged domestic violence for propensity purposes. Similarly, the court gave CALCRIM No. 1191A regarding the use of evidence of uncharged sexual assault for propensity purposes, and CALCRIM No. 1191B regarding the use of evidence of charged sexual assault for propensity purposes. Bethell claims that giving separate instructions for uncharged and charged offenses was confusing and unreconcilable. His argument is limited to the burdens of proof applicable to using uncharged offenses versus charged offenses for purposes of propensity evidence.

That is, in accordance with CALCRIM No. 852A and CALCRIM No. 1191A, the court instructed the jury that the uncharged offenses must be proven by a preponderance of the evidence before the jury could conclude from that evidence that Bethell was disposed or inclined to commit domestic violence or sexual offenses. On the other hand, in accordance with CALCRIM No. 852B and CALCRIM No. 1191B, the court instructed the jury that the charged offenses must be proven beyond a reasonable doubt before the jury could conclude from that evidence that Bethell was disposed or inclined to commit domestic violence or sexual offenses.

Bethell does not contend that the instructions applied incorrect burdens of proof, or that the "A" instructions regarding the use of uncharged offenses were incorrect, or that the "B" instructions regarding the use of charged offenses were incorrect. Instead, he argues the use of the "A" instructions and the "B" instructions *together* were contradictory and confusing. Specifically, he claims it raises the question "as to how the jury

32

should consider evidence of charged offenses that it does not find to be true beyond a reasonable doubt" and speculates, without any reference to the record, that the jury would have been "more likely" to apply the lower preponderance of the evidence standard of proof in using such evidence for propensity purposes. We disagree. The instructions clearly told the jury that the charged offenses must be proven beyond a reasonable doubt in order for the jury to draw an inference of propensity from that evidence. There is no reason to believe the jury strayed from this instruction and applied an impermissibly lower standard of proof. To the contrary, we are required to presume the jury understood and followed the instructions they were given. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957.)

Bethell's claim that the instructions were argumentative relies on his position that the prosecutor's case relied heavily on evidence of sexual assault and domestic violence that "had no relevance to the charged offenses." As we have already discussed, the uncharged acts of sexual assault and domestic violence were relevant as propensity evidence under Evidence Code sections 1108 and 1109. Contrary to Bethell's claim, the jury instructions did not "thr[o]w the court's weight behind the prosecutor's case," but rather instructed the jury as to the proper use of the propensity evidence. Again, Bethell does not contend the instructions were incorrect.

Bethell's argument that the jury instructions allowed the complaining witnesses B.W. and S.M. to corroborate their own accusations is another attack on the admissibility of the propensity evidence itself, rather than the jury instructions. However, he relies on cases that predate Evidence Code sections 1108 and 1109, namely *People v. Stanley* (1967) 67 Cal.2d 812 and *People v. Smittcamp* (1945) 70 Cal.App.2d 741. Additionally, this case is distinguishable from *People v. Gonzales* (2017) 16 Cal.App.5th 494

(*Gonzales*), which Bethell relies on to assert that there is an issue when propensity evidence consists solely of the victim's own testimony. Here, B.W.'s testimony was admitted as propensity evidence regarding charges involving S.M., and M.G., who was not a complaining victim, provided testimony that was admitted as propensity evidence regarding the charges involving S.M. and B.W. Thus, the propensity evidence did not consist solely of the victims' own testimony regarding Bethell's uncharged acts of sexual assault or domestic violence toward them. Regardless, *Gonzales* noted that nothing in Evidence Code section 1108 limits its effect to the testimony of third parties and instead allows the admission of uncharged sexual offenses from any witness, subject to Evidence Code section 352. (*Gonzalez,* at p. 502.)

Bethell argues the deficiencies in the instructions were so significant that they lowered the burden of proof, resulting in a prejudicial violation of due process. We disagree and conclude that if there was error in the jury instructions regarding propensity evidence, it was harmless by any standard. While Bethell provides no prejudice analysis, we note that the jury found Bethell not guilty of the forcible oral copulation charge in count 1 and did not reach a verdict on the forcible oral copulation charge in count 2. This shows that the jury carefully deliberated, and understood and applied the applicable burdens of proof. And as we have already discussed, there was corroborating evidence (unrelated to propensity evidence) of the charges that the jury convicted on—W.M. testified that he witnessed Bethell's domestic violence of S.M., and J.B. testified that he saw photographs of Bethell sexually assaulting B.W.

## DISPOSITION

The judgment is affirmed.

CASTILLO, J.

WE CONCUR:

BUCHANAN, Acting P. J.

KELETY, J.